**Opinion filed July 10, 2026**



In The

# Eleventh Court of Appeals

_____

## No. 11-25-00011-CR

_____

## JAMES MICHAEL SIEPL, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 82nd District Court**

**Falls County, Texas**

**Trial Court Cause No. 11297**

## M E M O R A N D U M   O P I N I O N

A jury found Appellant, James Michael Siepl, guilty of murder, a first-degree felony, and assessed his punishment at confinement for life in the Institutional Division of the Texas Department of Criminal Justice.[1]  *See* TEX. PENAL CODE ANN.

---

[1]This appeal was transferred to this court from the Tenth Court of Appeals pursuant to a docket equalization order issued by the Texas Supreme Court. *See* TEX. GOV'T CODE ANN. § 73.001 (West Supp. 2025).

§ 19.02(b)(1), (c) (West Supp. 2025). The trial court sentenced Appellant accordingly.

In one issue, Appellant argues that the evidence is insufficient to support the jury's rejection of his claim of self-defense. We affirm.

## I. *Factual and Procedural History*

On December 18, 2022, the Falls County Sheriff's Office was dispatched in response to a 9-1-1 call about a shooting. Appellant, his wife, Ashley Marie Siepl, and their daughter, M.S.,[2] were waiting outside their residence when law enforcement arrived. Ashley's half-brother, Lawrence Ostwald, was found deceased in the den, and two firearms were recovered in the kitchen.

Ashley testified that she and Ostwald had been raised together in the home of their grandmother Doris Basinger. Ashley moved out at fifteen, and at seventeen, she became pregnant and gave birth to M.S. Ashley, M.S., and M.S.'s biological father, Jason Terrell subsequently moved into Basinger's home, and Ostwald moved out.

When Ashley was twenty-four, she met and dated Appellant, who was over twenty years her senior, at the hospital where they both worked. Ashley was still living with Terrell at the time. About a month after Ashley began dating Appellant, Terrell assaulted Ashley and was arrested. Appellant moved into Basinger's home on the same day as Terrell's arrest. One and one-half months later, on November 19, 2018, Ashley and Appellant were married. And, in the summer of 2019, Ostwald moved back into Basinger's home to live with Ashley, Appellant, M.S., and Basinger.

Ashley testified that her relationship with Appellant had been tenuous at times and described an incident in 2019 during which Appellant pointed a firearm at her

---

[2]M.S. is Appellant's adopted daughter.

and M.S. when she pulled into the driveway. As Ashley left for Ostwald's house, Appellant pointed the gun at himself. Ashley testified that she reported the incident but declined to "file charges" because she feared he would retaliate if she did. Text messages exchanged between the two throughout their marriage reflecting Appellant's temper and control issues were admitted into evidence. In one text message to Ashley, Appellant cautioned, "I Love you, but For the Love of God don't test me." Appellant texted that he needed therapy and someone to "[t]each [him] that [he] can't just hurt people when they disrespect [him] and take advantage of [him]." Appellant continued, "I don't want to lose my temper. I need to work on that. Otherwise Lord help us all." Other texts indicated that Appellant wanted Ashley to quit her job because "[h]e didn't have control when [she] was at work." The State also introduced text messages between Appellant and Ostwald indicating a dispute over Ostwald's lack of contribution to the household expenses.

On December 17, 2022, the day before the shooting, Ashley and Appellant had an argument during dinner, and Appellant requested access to Ashley's phone to check her work app. Ashley testified that Appellant woke up around 2:00 a.m. on December 18, 2022, still upset, and that he stayed up the rest of the night going through her work app.

Home security cameras captured Appellant and Ashley pacing around the kitchen and den throughout the night. Ashley testified that the cameras had initially been set up by Basinger, so that Ashley and Ostwald could check in on her when they were out of the house. After the gun incident, Appellant stripped Ashley of phone access to the cameras and added more security cameras. According to Ashley, Appellant had added cameras to their bedroom, M.S.'s bedroom, the kitchen, and the bathroom. At some unspecified point prior to the shooting, however, the cameras stopped working.

At approximately 7:20 a.m. on December 18, a camera captures Appellant next to Ashley in the den inserting a firearm inside a zippered pouch and placing the pouch on a shelf underneath the coffee table. M.S. and Ostwald woke up sometime around 8:00 a.m. Ashley testified that after breakfast, Ostwald told her and Appellant that he was going to Walmart to do some Christmas shopping and that he planned to take his dog to the groomers. Ostwald asked if M.S. could accompany him. Ashley testified that Appellant inexplicably refused to allow M.S. to go with Ostwald and instructed M.S. to go to her bedroom. Ashley testified that Appellant then retreated to their bedroom and returned with two pistols, one in each hand, and he pointed them at Ostwald. Ashley testified that she approached Appellant and attempted to "force[] his arms down." Appellant then fired a bullet from each pistol; one that struck Ostwald in the "back of his hip." Ashley testified that Appellant ignored her screams to stop, and he pushed her through the doorway before firing more rounds. During the physical struggle that ensued, Appellant hit Ashley in the head and knocked her down. Appellant then sat on Ashley to keep her down while he continued firing. Ashley testified that she was able to grab one of Appellant's guns and shot off a round, prompting Appellant to accuse her of trying to kill him. Ashley testified she asked Appellant to "[p]lease stop," and Appellant replied, "It's too late. It's already done." It was then that Appellant noticed M.S. had entered the den, having gotten off of Ashley, whom he had pinned to the floor. Appellant instructed Ashley and M.S. to go to M.S.'s room. When Appellant joined them in M.S.'s room, he still had a gun in his hand. Ashley testified that Appellant said, "[T]his is what I get; and this is what I deserve." Appellant then apologized, told them he loved them, and said that he was going to call his mother. Ashley testified that Appellant eventually called 9-1-1 and then changed his clothes before police arrived.

Although there were cameras inside the home, including in the den where the shooting occurred, there was an unexplained time lapse in the footage recovered. In "a still shot of the ADT camera in the den," the den appears unoccupied at 10:01 a.m. A zipper pouch can be seen on a shelf underneath the coffee table near the couch. In another still shot taken at 10:15 a.m., Ostwald is on his back on the floor between the couch and coffee table. The zippered pouch is no longer in view, and the couch cushion placement has been altered.

On cross-examination, during which Ashley was questioned by Appellant proceeding pro se with standby counsel, Ashley maintained that Appellant had not acted in her defense that morning when he shot Ostwald. Ashley testified that Ostwald had been walking away when Appellant shot him. Ashley further testified that the morning of the shooting, she had informed Appellant that she wanted a divorce.

M.S., who was eleven years old at trial, testified that on the morning of December 18, Ostwald had invited her to go with him to help him bathe his dog, but that Appellant did not allow her to go. M.S. stated that Appellant appeared to be angry at her mother, and he told M.S. to go to her room. M.S. did so but shortly thereafter, she heard "six or eight" gunshots. M.S. walked into the den and saw Appellant sitting on top of Ashley, who was on the floor and somehow under the coffee table.

Keaton Smith, a criminal investigator for the district attorney's office, testified that Appellant made several calls after the shooting. Appellant called his mother at 10:21 a.m. and made an outgoing call to an individual named Patrick Henry at 10:52 a.m., and again at 10:58 a.m. About ten minutes later, Appellant scheduled his Facebook account for deletion.

At 11:18 a.m., Appellant called 9-1-1. In the 9-1-1 recording admitted at trial, Appellant can be heard stating, "I don't want to go too much into it. My brother-in-

law and I had a -- an argument, which escalated into violence and, um, I think he's dead." Appellant declined to elaborate or answer questions regarding the location of Ostwald's body or about the shooting.

Dr. Amy Gruszecki, the forensic pathologist who performed the autopsy on Ostwald, testified that Ostwald sustained a single gunshot wound to his right eye and five gunshot wounds to his back. Dr. Gruszecki testified as to the trajectories of each bullet. According to Dr. Gruszecki, a fragment and four projectiles were also recovered from the deceased, found lodged in his chest, armpit, and near his groin area. Ostwald tested negative for drugs and alcohol. Dr. Gruszecki opined that Ostwald died from multiple gunshot wounds.

Falls County Deputy Sheriff Keenin Ringo testified that only two firearms were recovered at the residence; both were Taurus 9-millimeter pistols and they were labeled "Number 12" and "Number 13," respectively, for identification. Four projectiles were recovered during the autopsy, and four projectiles along with twelve shell casings were recovered from the residence. The following sketch was admitted, indicating the location of the recovered shell casings, projectiles, bullet holes, cameras, and Ostwald.



6

Alexis Reaves, a forensic scientist in the Texas Department of Public Safety Crime Laboratory Firearms and Toolmark Division, testified that she received eight projectiles and a fragment to test. Three bullets were identified as being fired from firearm Number 13 and five were fired from Number 12. Reaves was unable to identify the source of the fragment because the fragment was not suitable for microscopic comparison. Regarding the twelve shell casings recovered, Ashley Roy, the Waco Police Department Laboratory Manager, testified that she had determined that one of the recovered guns had been fired five times and the other had been fired seven times. Jeremy Reynolds, an emergency medicine physician assistant and Lieutenant Colonel in the Army National Guard, who had completed three tours in Iraq, opined that, based on his training, experience, and examination of the evidence, the shots did not appear to have been fired in self-defense.

Before taking the stand at trial, Appellant called his mother, Judy Siepl, to testify. Judy testified that she received a call from Appellant on the morning of December 18, and that Appellant had told her he had "taken someone's life."

Appellant testified that his issues with Ashley stemmed from years of mistrust. While addressing the 2019 incident, Appellant stated that he had pulled a gun out because Ashley had run over his foot in the driveway and appeared as if she was going to run over him again. Appellant denied pointing the gun at Ashley.

With respect to the day of the shooting, Appellant conceded that, as captured in the recordings, he had "barked at [Ashley]" and "acted inappropriately, for hours." Amidst the ongoing argument over Ashley's workplace relationships on December 18, Appellant alluded to an incident, shared in confidence by Ashley, that Ostwald had molested her as a child. Appellant explained that to be the reason why he prohibited M.S. from leaving with Ostwald that morning. According to Appellant, the following transpired after he told Ostwald that he would not be "f----g taking her anywhere":

> He saw the look in my eyes. I saw the look in his eyes. [Ostwald] was bigger than me; I didn't know or care at that moment. I backed away from him and he turned and walked away from me. I heard a, "No."
>
> I saw [Ashley] running at me, away from [Ostwald]. There were two guns, two, on the dresser in the bedroom. I looked down at both of them. I picked them up and I looked at [Ostwald] and shot; because I saw [Ostwald] bending over to grab a pistol from underneath that coffee table.
>
> I fired and, I believe I hit him in the leg. I had no intent to hurt or kill [Ostwald]. But when Ashley was running at me, away from him, because he had a gun, we were in a small space, I'm a big guy, she couldn't have run by me, she ran and hit me in the face, like, face-to-face, bumped our faces, knocked me off my balance, and as I was falling, I was firing, because I thought [Ostwald] was firing back and shooting at Ashley to get to me. And I reacted and continued shooting because I wasn't going to let him hurt her. I wasn't going to let him kill me.

Appellant testified that after falling onto the floor, he noticed Ostwald "did not have a gun in his hand anymore" and Appellant had dropped one of the two pistols that he was holding "because [he] did not want to shoot [his] wife on accident." Appellant testified that Ashley grabbed the gun he had just released and fired at Ostwald before pointing the gun toward him. Appellant said that he slapped the gun out of Ashley's hand, and that they both fell to the floor. Afterwards, he moved the gun "from [Ostwald's] body" and hid it. Appellant testified that he called 9-1-1 but did not provide an explanation as to why he did not notify law enforcement about the third gun purportedly used by Ostwald.

On cross-examination, Appellant initially acknowledged that Ostwald had not said any threatening words or tried to get to M.S.'s bedroom before Appellant went to retrieve his two guns. Appellant later stated that Ostwald had told him, "I'm gonna take her. I got to take her. I'm going to take her," which prompted Appellant to say, "You're not going to f-----g take her." After that exchange, Appellant

8

"backed off" and headed to his bedroom. Appellant testified, "I went to step into my bedroom. I heard my wife start to say, 'No,' and then my face was half out and half in when I then visualized [Ostwald] reaching down to his left and grabbing that revolver." Appellant maintained that after placing the gun under the coffee table at 7:20 a.m. that morning, Ostwald knew it was there because Appellant had told him about it.

When the State sought to clarify how Appellant could see the coffee table if he was positioned halfway in his bedroom, the following colloquy occurred:

Q. Okay. So you can see that coffee table when you're halfway in your bedroom?

A. No, ma'am; but I can see where he was -- what he was reaching for. I knew it was under there. I knew it was under there.

Q. So you never saw him reach for a gun, you just assumed maybe he was?

A. Yes, ma'am, that's correct. That is correct.

Q. Okay. All right. And so what do you do?

A. At that point, I reached down -- I looked down, I saw two pistols there.

Q. Are you in your bedroom now?

A. Half in/half out.

Appellant then agreed that "[a]t that time, [he] couldn't positively tell" that he saw Ostwald with a gun.

The State's rebuttal witnesses included Ostwald's former manager and coworker, who described Ostwald as a "gentle giant," "teddy bear," and contributing member of the community.

At the conclusion of trial, the jury was instructed on self-defense but it returned a guilty verdict.

9

## II. *Standard of Review and Applicable Law*

Self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's self-defense theory. *See Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018); *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991). A defendant has the burden of producing some evidence to support a defense claim. *Braughton*, 569 S.W.3d at 608; *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting affirmative defenses and explaining how burdens shift for self-defense). If the defendant produces some evidence supporting his self-defense claim, the State has "the burden of persuasion to disprove the raised defense." *Zuliani*, 97 S.W.3d at 594. The State's burden does not require the production of any additional evidence; instead, "it requires only that the State prove its case beyond a reasonable doubt." *Id.*; *see Saxton*, 804 S.W.2d at 913. Because the State must disprove a defense claim by establishing its case beyond a reasonable doubt, we review legal and factual sufficiency challenges to the jury's rejection of a defense claim under the legal sufficiency standard. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd); *see also Saxton*, 804 S.W.2d at 914.

We review a challenge to the sufficiency of the evidence under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010); *Polk v. State*, 337 S.W.3d 286, 288–89 (Tex. App.—Eastland 2010, pet. ref'd). Under the *Jackson* standard, we review all of the evidence in the light most favorable to the verdict and determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010). Thus, when reviewing the sufficiency of the evidence to support a conviction involving a claim of self-defense, we review the sufficiency of

the evidence to support a jury's rejection of a defendant's self-defense theory by examining all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense and also could have found against the defendant on the defense issue beyond a reasonable doubt. *Saxton*, 804 S.W.2d at 914 (citing *Jackson*, 443 U.S. 307).

When conducting a sufficiency review, we defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979); *Brooks*, 323 S.W.3d at 899. This standard accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). When the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict and defer to that determination. *Jackson*, 443 U.S. at 326; *Clayton*, 235 S.W.3d at 778.

It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *Hooper*, 214 S.W.3d at 13. Because evidence must be considered cumulatively, appellate courts are not permitted to use a "divide and conquer" strategy for evaluating the sufficiency of the evidence. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015). Instead, appellate courts must consider the cumulative force of all the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017).

11

Relevant to this appeal, a person commits the offense of murder if the person "intentionally or knowingly causes the death of an individual." PENAL § 19.02(b)(1). The indictment alleged in a single paragraph that Appellant "intentionally and knowingly cause[d] the death of an individual, namely [Ostwald] by shooting [Ostwald] with a firearm."

In asserting self-defense, the use of force is justified "when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." *Id.* § 9.31(a) (West 2019). In the same manner, the use of deadly force against another is justified "if the actor would be justified in using force against the other under Section 9.31; and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force." *Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3). A reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. *Id.* § 1.07(a)(42). Under certain conditions, an actor's belief that deadly force was immediately necessary is presumed to be reasonable. *Id.* § 9.32(b).

## III. *Analysis*

Appellant contends that the evidence is insufficient because his testimony described a rapidly escalating domestic dispute and his perception that Ostwald was reaching for a revolver. According to Appellant, his "visualizing Ostwald reaching for a revolver," combined with Ashley's screams, supports his claim that he acted in self-defense. He further argues that the fact Ostwald was shot in the back does not negate self-defense when considered in light of Appellant's total account of the events. Appellant also maintains that his failure to flee and his eventual surrender provide a strong inference of innocence.

The record, however, contains evidence from which the jury could reasonably reject Appellant's account and conclude beyond a reasonable doubt that he did not act in self-defense the morning that he shot Ostwald. We reiterate that the jury is the sole judge of the credibility of witnesses and the weight to be given their testimony. *See Metcalf v. State*, 597 S.W.3d 847, 859 (Tex. Crim. App. 2020). As the exclusive factfinder, the jury is entrusted to resolve conflicts in the evidence, evaluate credibility, and determine what weight to assign competing accounts. *See id.* at 855. We do not second-guess those determinations on appeal. *See Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016).

Here, Ashley testified unequivocally that Appellant had not acted in self-defense when he shot Ostwald. Ashley denied ever telling Appellant that Ostwald had sexually abused her as a child, and she denied that Ostwald was insistent on taking M.S. with him that morning—i.e., Appellant's purported motivation for acting defensively. According to Ashley, Appellant had been upset with her over an incident that occurred at work. Ashley testified that after Ostwald asked once whether M.S. could accompany him on errands and Appellant refused the request, Appellant then left the room, returned with two firearms, pointed them at Ostwald, and began shooting while Ostwald had his back turned.

The jury also heard other evidence undermining Appellant's version of events. *See Borton v. State*, 683 S.W.3d 459, 466 (Tex. App.—San Antonio 2023, no pet.) (holding that a jury could reasonably reject a self-defense claim by concluding that the defendant was the aggressor based on other evidence). Dr. Gruszecki confirmed that Ostwald had been shot five times in the back and once in the eye. Ostwald was found lying face up on the floor against the couch in the den. Reynolds, the State's expert witness, testified that the location and trajectory of the gunshot wounds were inconsistent with a claim of self-defense.

Appellant additionally admitted, and the recordings showed, that he had been angry most of the night and was still angry when Ostwald approached him about taking M.S. out. Appellant then waited over an hour to call 9-1-1 after shooting Ostwald, "hid" Ostwald's alleged firearm, and changed his clothing before police arrived. When speaking to the 9-1-1 operator, Appellant declined to answer questions regarding the location of the body or shooting. Appellant similarly declined to provide a statement to law enforcement and made no mention of the third firearm purportedly wielded by Ostwald.

Further, although Appellant testified that he believed Ostwald was retrieving a firearm from beneath the coffee table, he conceded on cross-examination that he never actually saw Ostwald reach for the gun; Appellant merely assumed Ostwald was reaching for it. A rational jury could reasonably question Appellant's ability to observe such conduct from the position he claimed to occupy at the time. *See Martinez v. State*, 633 S.W.3d 698, 707 (Tex. App.—Houston [14th Dist.] 2021, pet. ref'd) ("We resolve any inconsistencies in the witnesses' testimony in favor of the jury's verdict in a legal sufficiency review.").

Moreover, even though Appellant asserted that he fired to protect himself and his family, the jury could consider his straightforward testimony acknowledging that he intentionally shot Ostwald, and in its true context, accept that as evidence of an intent to cause Ostwald's death. *See id.*; *Slater v. State,* No. 02–11–00368–CR, 2013 WL 2631194, at \*5–6 (Tex. App.— Fort Worth June 13, 2013, pet. ref'd) (mem. op., not designated for publication) (concluding evidence to be sufficient to support a finding that the shooting was intentional because the law presumes an intent to kill when a gun is fired at close range and death results, even though defendant claimed shooting was accidental). Here, the jury was free to assess the motives and credibility of the witnesses, weigh the conflicting evidence, and reject Appellant's version of events. *See Metcalf*, 597 S.W.3d at 859.

Viewing the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have found beyond a reasonable doubt the essential elements of murder and also could have found against Appellant on his claim of self-defense beyond a reasonable doubt. *See Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Saxton*, 804 S.W.2d at 914. Accordingly, we overrule Appellant's sole issue on appeal.

IV. <i>This Court's Ruling</i>

We affirm the judgment of the trial court.

W. BRUCE WILLIAMS

JUSTICE

July 10, 2026

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.